**S T A T E   O F   M I C H I G A N**
**C O U R T   O F   A P P E A L S**

In re MESSER/SAWYER, Minors.

UNPUBLISHED
August 16, 2018

No. 341381
Monroe Circuit Court
Family Division
LC No. 17-024153-NA

Before: SWARTZLE, P.J., and CAVANAGH and M. J. KELLY, JJ.

PER CURIAM.

Respondent-mother appeals as of right the trial court's order terminating her parental rights to her minor children, SM and MS, under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (b)(*iii*), (g), and (j). We affirm.

## I. BACKGROUND

This child-protective proceeding results from respondent-mother's failure to protect her son, MS, from a physically abusive live-in boyfriend, M. Osborn. The alleged abuse occurred over an 18-month period and culminated with MS incurring life-threatening injuries that may result in permanent cognitive impairment.

Respondent-mother's daughter, SM, was born in 2004. Tragically, in 2006, respondent-mother's husband died while deployed to Iraq with our armed forces. Several years later, respondent-mother began a relationship with A. Sawyer and gave birth to Sawyer's son, MS, in 2012. In 2014, Sawyer was incarcerated on several non-violent criminal charges tangentially related to his substance-abuse issues and, about that time, respondent-mother's relationship with Sawyer ended.

Shortly after her relationship with Sawyer ended, respondent-mother, in October 2014, began dating Osborn. By January 2015, Osborn was living in respondent-mother's home with the two children. Respondent-mother's parents, R. Miller and G. Miller, frequently cared for the children while respondent-mother was at work. MS went to the Millers' home three to four days a week, but if respondent's parents were unavailable, Osborn would care for the children. Accordingly, once or twice a week, Osborn had unsupervised contact with MS. Osborn also had daily parental duties with MS, including bathing the child. Respondent-mother never had any concerns about leaving MS in Osborn's care.

-1-

SM testified that, for the first several months of respondent-mother's and Osborn's relationship, Osborn treated the children appropriately. Approximately nine months into the relationship, however, Osborn's behavior changed. On at least 16 occasions, the first of which began around Christmas 2015, SM heard, but did not see, Osborn hitting MS and yelling at him. SM also saw bruises on MS's body.

At least four specific instances of injury were documented in MS's medical records. First, in Winter 2016, MS was taken to a pediatric nurse practitioner, Nurse Deborah Wesner, because several bruises were found on his body. Nurse Wesner examined MS, but found no medical explanation for his excessive bruising. With regard to the second incident, in Spring 2016, while respondent-mother was at work, Osborn again took MS to Nurse Wesner to have a bump on MS's clavicle examined. Osborn reported, and respondent-mother later concurred, that MS fell in a bounce house the month before and that the bump had been there for two weeks but that MS was using his arm normally. Just from observation, it was evident to Nurse Wesner that MS had fractured his clavicle. Subsequent X-rays revealed an old, healing fracture. Nurse Wesner also noted three bruises on MS's arm. Nurse Wesner recommended a follow-up with a specialist, but respondent-mother waited several days to make the appointment. When MS finally saw a specialist, the specialist concluded that there was no treatment available for MS because too much time had passed since the injury.

Nurse Wesner believed that the bounce-house explanation was inconsistent with MS's injury—specifically, a child with a fractured clavicle would be in a great deal of pain and would not be using his arm normally. Accordingly, Nurse Wesner suspected that MS was being abused and filed a complaint with Child Protective Services (CPS). Despite the concerns of the medical professional, CPS found insufficient evidence to substantiate the complaint.

Concerning the third incident, in Summer 2016, respondent-mother and Osborn celebrated their relationship in a "commitment ceremony." The couple appears to have chosen a commitment ceremony over a traditional marriage because respondent-mother was receiving Veterans Administration benefits that would be lost in the event of her remarriage. After the ceremony, respondent-mother and Osborn went on an overnight "honeymoon" and left the children in the care of the Millers. While in the Millers' care, MS complained of leg and stomach pain and appeared lethargic. The Millers took MS to an urgent-care facility where Nurse Practitioner Robbyn Smith examined MS and noted several bruises, in multiple stages of healing, on MS's arms, legs, and back. MS's abdomen was also tender and he was unusually thin, having lost weight at a developmental stage when children usually gain weight. Nurse Smith believed that MS was being abused and CPS again investigated, but failed to substantiate any abuse.

Several months passed without another documented injury. Finally, in Spring 2017, MS complained of pain while at preschool. When he was told that respondent-mother was called to pick him up, MS became upset and told the preschool teacher that he did not want to go home. Respondent-mother picked MS up from school and took him home. According to respondent-mother, MS appeared fine the following day, but she declined to send him to preschool. Instead, respondent-mother left MS in the care of the Millers while she went to work. During the course of the day, MS did not improve and his stomach became distended. Consequently, the Millers took MS to a local hospital. Respondent-mother left work and met MS and her parents at the

hospital. Believing that MS was suffering from gas and dehydration, the medical providers discharged MS with instructions to give him plenty of fluids.

Three days later, respondent-mother left MS in Osborn's care while she went to work. According to respondent-mother, MS appeared to be fine when she left for work, and, when she returned from work around 8:30 that night, MS was already in bed. Respondent-mother testified that she stayed up until about 1:00 a.m. that night and admitted that both she and Osborn were smoking marijuana. This marijuana use was not isolated, as respondent-mother testified that she and Osborn had used marijuana while the children were present on at least 30 occasions. Respondent-mother and Osborn checked on MS at least five times throughout the evening. The following morning, respondent-mother awoke to a frantic Osborn holding MS and stating that they needed to go to the hospital. According to Osborn, he went into MS's room and found MS thrashing under his bed. When Osborn pulled the child out from under the bed, MS could not speak or move his left side. Respondent-mother and Osborn took the child to the hospital.

After an initial evaluation, MS was transferred to Children's Hospital of Michigan in Detroit, where he was diagnosed as suffering from a subdural hematoma, brain shrinkage, and a bowel perforation. MS was taken into emergency surgery to repair the damage to his bowel, during which Dr. Christina Shanti found multiple bruises on MS's body. Dr. Shanti opined that MS sustained the abdomen injuries within two days of his presentation to the hospital and that the injury would have required a direct, high-impact blow. This opinion directly contradicted respondent-mother's claim that MS sustained the injuries while playfully roughhousing eight days prior. Moreover, Dr. Shanti opined that MS would have been in a great deal of pain for days before treatment, meaning that he would not have been "fine" the night before. Dr. Shanti informed respondent-mother that MS's injuries were "non-accidental," but, respondent-mother still allowed Osborn to visit with MS in the hospital.

During MS's two-month hospital stay, petitioner successfully moved the trial court to remove MS from respondent-mother's care and place him in the care of his paternal grandmother. SM was also removed from respondent-mother's care and placed with a paternal aunt. The children remained in their relative placements throughout the pendency of the trial-court proceedings and thrived with their new caregivers. MS was being taken to regular medical and therapy appointments by his grandmother, and his grandmother was actively working with school officials to put together an individualized educational plan to meet MS's special needs. SM's aunt testified that SM was suicidal when she was placed in her care, but that SM was receiving counseling for her cutting behavior, appeared happier, and was improving her grades. SM testified that she viewed her cousins as her sisters and that she would be happy if placed permanently with her aunt, although she would be sad that she would not be able to live with respondent-mother. Both caregivers were willing to adopt the children.

The termination trial focused in large part on respondent-mother's knowledge of the abuse Osborn inflicted upon her son. Several persons close with the family testified that they had become suspicious that Osborn was abusing MS and that they had conveyed these concerns to respondent-mother, but respondent-mother dismissed the allegations and, on a few occasions, ceased contact with the accuser. Indeed, SM testified that she had told her mother about the abuse on numerous occasions, and that respondent-mother had dismissed the allegations and accused SM of lying. An investigating police officer testified that respondent-mother had

admitted to him that several family members had expressed concerns that Osborn may be abusing MS. Moreover, the officer testified that, during his interview of respondent-mother, respondent-mother gave inconsistent explanations for the child's injuries. According to the officer, respondent-mother admitted that, at times, she had been suspicious that Osborn was abusing MS.

MS was interviewed by Elizabeth Smith, an expert in child forensic interviewing. Smith testified that MS told her that Osborn—the "dad he doesn't like"—"torture[d]" and "hurt" him. Smith also testified that MS referred to respondent-mother by her first name, instead of using any of the maternal monikers. Dr. Bethany Morh, the medical director of the University of Michigan's Child Protection Team, examined MS shortly after his discharge from the hospital. Dr. Morh echoed the other professionals' opinions that MS's history of injury was consistent with child abuse. Dr. Morh also testified that, although MS's prognosis was unclear, his brain injuries could cause him to suffer future motor delays and cognitive impairment.

For her part, respondent-mother testified that she ended her relationship with Osborn and evicted him from her home after MS was hospitalized. Respondent-mother, however, admitted that she did not end the relationship because she believed Osborn was responsible for MS's injuries, but rather because Osborn was yelling at her and she could not "deal with his attitude." According to respondent-mother, she did not notice any unusual injuries to MS during the first year of her cohabitation with Osborn. Respondent-mother testified, however, that during the second year, she noticed that MS "started getting bruising," and that, on at least one occasion, "fingerprint bruises" were present on MS's jawline. Also around this time, respondent-mother noticed that, when it was time to leave the Millers' home, MS would cry and beg not to return home. Still, respondent-mother seemed uncertain that Osborn was responsible for at least some of MS's serious injuries. Respondent-mother also admitted that, while MS was in her care, he was more than a year behind on his vaccines because she "overlooked it." Regarding SM, respondent-mother testified that she believed that, while SM was in her care, SM was getting straight A's in school when, in fact, the child was receiving C's and D's.

The trial court concluded that statutory grounds existed to terminate respondent-mother's parental rights under MCL 712A.19b(3)(b)(*i*), (*ii*), (*iii*), (g), and (j). The trial court expressly considered the children's placement with relatives but, despite this placement, concluded that termination of respondent-mother's parental rights was in both children's best interests.

This appeal followed.

## II. ANALYSIS

Appellate courts "review for clear error both the court's decision that a ground for termination has been proven by clear and convincing evidence and, where appropriate, the court's decision regarding the child's best interest." *In re Trejo*, 462 Mich 341, 356–57; 612 NW2d 407 (2000); see also MCR 3.977(K). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296–97; 690 NW2d 505 (2004).

*Statutory Grounds*. Respondent-mother first argues that the trial court erred by finding statutory grounds to terminate her parental rights to both children. "In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). Here, respondent-mother's parental rights were terminated under MCL 712A.19b(3)(b)(*i*), (b)(*ii*) (b)(*iii*), (g), and (j), which permit termination under the following conditions:

> (b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:

> (*i*) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.

> (*ii*) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.

> (*iii*) A nonparent adult's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse by the nonparent adult in the foreseeable future if placed in the parent's home.

> \* \* \*

> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

> \* \* \*

> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The trial court did not err in concluding that statutory grounds existed to terminate respondent-mother's parental rights under MCL 712A.19b(3)(b)(*ii*), (g), and (j). The record established that MS sustained several severe physical injuries over the course of several months while in respondent-mother's care. Despite concerns by numerous family members and medical professionals that Osborn was the source of these injuries, respondent-mother repeatedly placed MS in Osborn's care—even allowing Osborn to visit the child while he was in the hospital recovering from the life-threatening, and possibly life-altering, injuries that brought the children under the trial court's jurisdiction. Respondent-mother admitted to having her own concerns that Osborn was abusing MS, but, even after being presented at trial with evidence that should have reasonably confirmed these suspicions, she still appeared to question whether MS's injuries were

-5-

caused by Osborn. Respondent-mother's repeated failure to protect MS from Osborn, despite the increasing severity of his injuries, established that respondent-mother failed to protect MS from physical abuse despite having an opportunity to do so. Although there was no evidence that SM was abused, because MS is SM's brother, respondent-mother's failure to protect MS constitutes a de facto failure to protect both children. MCL 712A.19b(3)(b)(*ii*).

Similarly, respondent-mother's failure to protect MS from Osborn is evidence of respondent-mother's failure to provide proper care and custody for both children. Additional evidence of respondent-mother's failure to provide proper care and custody comes from the facts that respondent-mother regularly smoked marijuana while the children were in her care, failed to provide for MS's medical needs (both skipping standard immunizations and delaying treatment after injury), and had little understanding about how SM was progressing academically.

Regarding any future risk of harm, respondent-mother's past behavior is the best predictor of her future ability to care for the children. The record demonstrates that respondent-mother regularly placed her own wants above her children's safety. Despite being presented with substantial evidence that Osborn abused her child, respondent-mother failed to remove the threat. Rather, respondent-mother made various excuses for SM's injuries and ceased contact with those that threatened her relationship with Osborn. Respondent-mother admitted that she evicted Osborn not because she was concerned about her children's safety, but rather because she could not handle Osborn's attitude and, perhaps most egregiously, instead of seeking medical care for her son's serious injuries, respondent-mother smoked marijuana with the child's abuser and delayed care until the child began to have a seizure. As noted above, the record also makes clear that respondent-mother failed to address her children's medical or academic needs and, given the children's increased need for medical, emotional, and academic support following their months-long ordeal with Osborn, there is little in the record to suggest that respondent-mother will be able to provide proper care or custody in the future. Similarly, the record makes clear that the children faced a reasonable risk of future harm if placed in respondent-mother's care—either from direct abuse at the hands of people respondent-mother brings into the children's lives or from respondent-mother's inability to provide for the children's critical medical, emotional, and academic needs.

Thus, the record establishes that respondent-mother failed to protect the children from physical abuse, that respondent-mother failed to provide the children with proper care and custody, that there is no reasonable expectation that respondent-mother will be able to provide the children with proper care and custody, and that the children were at a reasonable risk of abuse, physical harm, and emotional harm if placed in respondent-mother's care. Accordingly, statutory grounds to terminate respondent-mother's parental rights existed under MCL 712A.19b(3)(b)(*ii*), (g), and (j). Whether termination was also appropriate under MCL 712A.19b(3)(b)(*i*) and (*iii*) presents a closer question given that there is no evidence that respondent-mother physically abused the children or that Osborn would be a continuing presence in respondent-mother's life. Nonetheless, because only one statutory ground need be proven to terminate a parent's rights, we need not address these additional grounds. *In re Trejo*, 462 Mich at 360.

*Best Interests*. Next, respondent-mother challenges the trial court's finding that termination of her parental rights was in the children's best interests. "If the court finds that

-6-

there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). "[W]hether termination of parental rights is in the best interests of the child must be proven by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). "The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). "To determine whether termination of parental rights is in a child's best interests, the court should consider a wide variety of factors that may include 'the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home.' " *Id*., quoting *In re Olive/Metts Minors*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012). Other relevant factors include any "history of domestic violence, the parent's compliance with his or her case service plan, the parent's visitation history with the child, the children's well-being while in care, and the possibility of adoption." *Id*. at 714.

Respondent-mother argues that termination was inappropriate because the children were bonded to her and that, because the children were safe in their relative placements, there was no harm in continuing these placements while she participated in services to facilitate reunification. While a parent-child bond would generally weigh against termination, here, we find dubious respondent-mother's assertion of a bond. MS called his mother by her first name, rather than any parental moniker, and would become upset anytime he returned to her care. While SM testified that a bond existed between her and respondent-mother, that bond is obviously strained by respondent-mother's refusal to believe SM that Osborn was abusing MS and failure to protect SM's brother from harm. In any event, assuming that there is a bond, respondent-mother's repeated endangerment of the children and inattentiveness to their needs indicate that any bond was not the positive parental bond critical to the children's development.

With regard to the children's placement with relatives, while the trial court must consider relative placement as a factor weighing against termination, termination of parental rights is still appropriate if the record supports that termination, on the whole, is in the children's best interests. *In re Olive/Metts*, 297 Mich App at 43. As discussed previously, respondent-mother repeatedly endangered her children to fulfill her own need for companionship. Respondent-mother ignored increasingly obvious evidence that Osborn was abusing MS and frequently delayed in seeking medical care for MS's injuries. As a result of this intentional ignorance, MS faced life-threatening injuries that have the potential to impact his cognitive abilities in the future. While there is no evidence that SM was physically abused, respondent-mother repeatedly ignored SM's calls to protect MS and failed to recognize SM's mental-health and academic needs. There is no reasonable possibility that respondent-mother could rectify these deficiencies in the future such that she will be able to provide the children with a safe and appropriate home. We agree with the trial court that termination was in the children's best interests.

*Ineffective Assistance of Counsel*. Finally, respondent-mother argues that she was deprived of the effective assistance of counsel. "The principles applicable to claims of ineffective assistance of counsel in the arena of criminal law also apply by analogy in child protective proceedings." *In re Martin*, 316 Mich App 73, 85; 896 NW2d 452 (2016). Accordingly, respondent-mother must show "that (1) counsel's performance was deficient, falling below an objective standard of reasonableness, and that (2) the deficient performance

prejudiced" her defense. *Id*. We review respondent-mother's unpreserved claim of ineffective assistance for mistakes apparent on the record. *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94. If the record does not contain sufficient detail to support respondent-mother's ineffective-assistance claim, then she has effectively waived the issue. *Id*.

Respondent-mother argues that her attorney was ineffective for failing to present expert medical testimony to rebut the testimony provided by Dr. Mohr. Yet, respondent has not established what expert could have been called or what testimony could have been provided. The decision to call or not call an expert witness is presumed to be a matter of trial strategy, and, without these salient details, we are unable to evaluate whether counsel's decision not to call an expert was sound trial strategy or whether any prejudice resulted from the decision. *People v Russell,* 297 Mich App 707, 716; 825 NW2d 623 (2012). Respondent-mother has therefore waived this issue.

Affirmed.

/s/ Brock A. Swartzle
/s/ Mark J. Cavanagh
/s/ Michael J. Kelly

-8-